## LOCAL 1466, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Plaintiff,

v.

## COLUMBUS AND SOUTHERN OHIO ELECTRIC COMPANY, Defendant.

No. C–2–76–887.

United States District Court,
S. D. Ohio, E. D.

Aug. 21, 1978.

---

David Clayman, Clayman & Jaffy, Columbus, Ohio, for plaintiff.

John T. Billick, Porter, Wright, Morris & Arthur, Columbus, Ohio, for defendant.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on plaintiff's motion for summary judgment on its application to vacate an arbitrator's award.

Defendant has filed a motion to dismiss the plaintiff's application and to confirm the arbitrator's award.

## I

The plaintiff, Local 1466 of the International Brotherhood of Electrical Workers [hereinafter "the Union"], brought this action to vacate the award of an arbitration board handed down on November 23, 1976. The dispute arose from the assigning of certain maintenance employees at the Conesville Generating Station to a three-shift, seven day week by the defendant, Columbus and Southern Ohio Electric Company [hereinafter "the Company"]. The Union objected to this assignment, asserting that these employees had been on a single shift, eight hour day for years, and that under the collective bargaining agreement they could only be assigned to a "modified shift schedule" which was described in Article XII, Section 1(b) of the contract. The Company properly invoked arbitration, and the three member arbitration board upheld the right of the Company to assign these workers to the three-shift schedule. The Union then sought to vacate the award in this court, as beyond the power of the arbitration board which was unable under the contract to "alter the terms of this Agreement in making its award." (Article VII, Section 6). The award in this case, it is maintained, alters the terms of the agreement by excising and ignoring the provision establishing the modified shift schedule.

## II

■ In assessing the legal standard of review of an arbitrator's award, both Congress [1] and the Supreme Court [2] have made it clear that the Court's role is a limited

one, and that arbitration awards are presumptively valid. Beyond this general presumption, however, the review standard is difficult to apply, because most of the judicial articulations of the standard simply restate, rather than more specifically focus, the inquiry.

■ The standard for review was stated by the Supreme Court in the landmark *Steelworkers Trilogy*. In *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), Justice Douglas indicated, in his now famous phrase, that the arbitration award is valid if it "draws its essence from the collective bargaining agreement." *Id.* at 597, 80 S.Ct. at 1361. The First Circuit describes this standard as a "rule of non-reviewability." [3] A Court cannot, therefore, engage in a plenary review of the merits of the award; it can only determine whether the arbitrator has exceeded his power. [4]

The articulation of the Court's role in this area by the Sixth Circuit Court of Appeals has remained true to the language of the *Enterprise Wheel* case:

> [U]nless the award manifests a clear infidelity to the arbitrator's obligation of drawing the "essence" of the award from the bargaining agreement, a court must refuse to substitute its judgment on the merits for that of the arbitrator.

*Timken Co. v. Local Union No. 1123, United Steelworkers of America*, 482 F.2d 1012, 1014 (CA 6, 1973). Because the highly general nature of this language is very difficult to apply, and has produced arguably inconsistent results, [5] it is helpful to look to the factors which seem to have been determinative in particular cases.

---

1. 9 U.S.C. § 10, 61 Stat. 672 (1947).

2. *E. g., United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

3. *Bettencourt v. Boston Edison Co.*, 560 F.2d 1045, 1049 (CA 1, 1977).

4. Of course, a court may also vacate awards due to misconduct, or on other procedural

grounds, *see* 9 U.S.C. § 10, but those issues are not before the Court in this case.

5. *Compare Timken Co. v. United Steelworkers of America*, 492 F.2d 1178 (CA 6, 1974) *with Timken Co. v. Local Union No. 1123, United Steelworkers of America*, 482 F.2d 1012 (CA 6, 1973).

The classic abuse of arbitral power which court review will remedy is the case of the arbitrator who ignores the contract and bases the award on policies and preferences external to the contract. In such a case, the arbitrator is not fulfilling his duty to interpret the contract, but is dispensing "his own brand of industrial justice." *Steelworkers v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 597, 80 S.Ct. at 1361. Thus, a crucial initial inquiry for the Court is whether it can be fairly said that the arbitrator has focused upon the provisions of the collective bargaining agreement and that the decision is based upon an interpretation of those provisions. The determination that the award is in fact grounded in contract interpretation does not completely end the Court's inquiry, however. It is still possible that the decision "is 'unfounded in reason and fact,' . . . [and] is based on reasoning 'so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling' . . .'" *Bettencourt v. Boston Edison Co.,* 560 F.2d 1045, 1050 (CA 1, 1977). Thus, while an error in interpretation by the arbitrator will not usually permit vacation of the award, the award may be so clearly wrong as to be irrational; such an award "manifests a clear infidelity to the arbitrator's obligation of drawing the 'essence' of the award from the bargaining agreement . . ." *Timken Co. v. Local Union 1123, United Steelworkers of America,* 482 F.2d 1012, 1014 (CA 6, 1973).

A factor in determining the rationality of the arbitrator's decision which appears to be especially important is the relative ambiguity of the contract language at issue. *Timken Co. v. United Steelworkers of America,* 492 F.2d 1178, 1180 (CA 6, 1974):

> If a collective bargaining agreement is unclear and ambiguous in its terms, its construction should normally be determined by the arbitrator.

*See Monongahela Power Co. v. Local No. 2332, International Brotherhood of Electrical Workers,* 566 F.2d 1196, 1198-99 (CA 4, 1976).

### III

In applying the above standards to the case at bar, it is apparent that the arbitration board did focus upon the collective bargaining agreement in reaching its decision. In fact, the board's opinion cited the Management Rights Clause, Article III, Section 1(b)(3) as controlling the entire case because it preserved the Company's right to "assign to shifts." Because the rights described in Article III, Section 1 are absolute, as is typical, "[e]xcept as specifically limited by the terms and provisions of this Agreement," the board found in favor of the Company since nothing in Article XII, dealing expressly with shifts, "specifically limited" the provisions of the Management Rights Clause.

The next step is to determine whether the board's award is so palpably wrong and lacking in rational foundation as to violate the arbitrator's duty to draw his essence from the contract. The pivotal contract language in this dispute is in Article XII, Section 1(b), which provides as follows:

> An employee whose scheduled work day and scheduled work week both vary according to a pre-arranged schedule shall be considered as a shift worker. A modified shift schedule, consisting of two shifts only, is made applicable to the entire mechanical maintenance lines of progression in the generating stations and such schedule shall conform substantially to the second and third shifts worked by plant operators, having due consideration for a one-half hour unpaid lunch period in the case of such repairmen. When it becomes necessary for the Company to use such a modified shift schedule, the schedule will be posted 72 hours prior to the time it becomes effective and the employees who work on such modified shift shall be paid time and one-half their regular hourly rates for the first three (3) days worked. Each modified shift schedule shall be for a duration of not more than two (2) weeks. If a modified shift is not scheduled in advance, no notice need be posted but the men who work the

modified shift shall be paid time and one-half their regular hourly rates for the first five (5) days worked on such shift.

The Union maintains that this modified shift schedule's application to "the entire mechanical maintenance lines of progression in the generating stations" means that it applies to the employees at issue in this case. It is urged that this modified shift schedule, which requires the Company to pay overtime and to give notice, and which may only be used for a two week period, is the only means by which the Company can require these maintenance employees to work other than their traditional non-shift[6] schedule. The Company responds that the Company has the power to assign any of its employees to any shift schedule, but, in addition, it may also assign the maintenance lines to the modified shift schedule if it so desires. The bulk of Article XII, Section 1(b), it is claimed, is simply there to give the Company another option.

The Court does not hesitate to acknowledge that it finds the position of the Union much more persuasive than either the opinion of the arbitration board or the arguments of the Company. The board's contractual interpretation very questionably allows its interpretation of a general section, the Management Rights Clause, to control the case when there is a more specific section, Article XII, which deals expressly with shifts. It is somewhat astonishing that the board's opinion fails even to quote, much less deal with or explain, the provision for a modified shift schedule in Article XII, Section 1(b). As for the Company's explanation of the modified shift schedule, it is doubtful that the Company would ever exercise an "option" that would saddle it with

the duty to pay overtime, and to abandon the schedule within two weeks, when it could accomplish the same result without those burdens.

The Court does not suggest that the contract issue in this case is not a difficult one. Nonetheless, the modified shift schedule must mean something. The board had the opportunity to apply its peculiar knowledge of the customs and practices of this industry and these parties in order to explain the meaning of this clause, but it chose instead to rely unblinkingly on the Management Rights clause.[7]

Whether this interpretation was so faulty as to constitute a breach of the arbitrator's duty is a different question, however. The fatal blow to the plaintiff's case is the fact that the contract provisions governing this issue are at least ambiguous. In virtually every case in which an arbitration award has been vacated there has been both faulty reasoning and express language which required the contrary result. *Amanda Bent Bolt Co. v. International Union, Local 1549,* 451 F.2d 1277 (CA 6, 1971); *Timken Co. v. Local Union No. 1123,* 482 F.2d 1012 (CA 6, 1973).

In the present case there are too many unanswered questions to allow the Court to state with conviction that a result opposite to the board's award is expressly mandated. For example, Article XII, Section 1(f) refers to changes in work schedules resulting in changes in job evaluation. While this may refer only to those schedule changes which the Company is permitted to make, the clause is nonetheless ambiguous. Another question is raised by the fact that the modified shift schedule provision, which the Union maintains applies only to non-shift

---

**6.** Section 1(a) of Article XII of the contract defines non-shift workers as those "whose scheduled work day falls between the hours of seven (7) a. m. and seven (7) p. m. and whose scheduled work week does not vary . . . .." It was estimated that some of the employees involved in this case have been on non-shift schedules for as long as twenty-seven years. Arbitration Award, at 2.

**7.** There appears to be an increasing recognition that the arbitral process often falls short of the

paradigm presented in the Steelworkers Trilogy. There have been proposals to rectify this problem, but the approach centers on establishing more uniform arbitration procedures, rather than changing the ability of courts to review the merits of an award. *See* Abrams, *The Integrity of the Arbitral Process,* 76 Mich.L. Rev. 231 (1977). It is noteworthy that most of the safeguards that Professor Abrams has proposed were present in this case.

476

workers, appears in the section defining shift workers, rather than in the section defining non-shift workers. Also, there is no express provision designating the maintenance employees as non-shift workers.

Thus, the ambiguity of this contract must be resolved by the arbitrator. *Timken Co. v. United Steelworkers, supra* at 1180. The Court has no basis for ruling that the arbitration board has exceeded its authority when it cannot point to express language in the contract requiring the opposite result. Where the parties have ambiguity in the collective bargaining agreement, the risk of an erroneous interpretation by the arbitrator is borne by the party that disagrees with the arbitrator's award.

WHEREUPON, the Court determines that there is no genuine issue of material fact in dispute, and that the defendant's motion is meritorious. Plaintiff's motion for summary judgment is therefore DENIED. Defendant's motion to dismiss the application and to confirm the award is GRANTED.

The Clerk shall enter final judgment in favor of the defendant.